**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**RYAN C. HOWARD,**

                    **Plaintiff,**

        v.                                                    Case No. 1:16-cv-14-KBJ

**AL JAZEERA AMERICA, LLC, ET AL.,**

                    **Defendants.**

**PLAINTIFF'S CONSOLIDATED OPPOSITION**
**TO DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

Introduction ........................................................................................................................ 1

Factual Background ............................................................................................................ 2

    A.    Plaintiff Ryan Howard ..................................................................................... 2

    B.    The Al Jazeera Defendants ............................................................................... 5

    C.    The Dark Side: Secrets of the Sports Dopers .................................................. 6

    D.    The Defamatory Statements Contained In "The Dark Side" .............................. 7

    E.    Defendants' Disregard For The Truth Of The Statements About Howard ............ 9

    F.    The Instant Lawsuit ......................................................................................... 11

STANDARD OF REVIEW ................................................................................................ 11

ARGUMENT ..................................................................................................................... 12

I.    HOWARD HAS SUFFICIENTLY ALLEGED THE DEFAMATORY MEANING AND ACTUAL MALICE ELEMENTS OF HIS LIBEL AND FALSE LIGHT INVASION OF PRIVACY CLAIMS ......................................................................... 13

    A.    The Amended Complaint Adequately Alleges That Defendants Defamed Howard ................................................................................................................... 13

    B.    The Amended Complaint Adequately Alleges That Defendants Acted With Knowledge Of Probable Falsity Or Reckless Disregard For The Truth ............... 17

II.    COLLINS PUBLISHED DEFAMATORY MATERIAL REGARDING HOWARD ..... 22

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbas v. Foreign Policy Grp., LLC,*
   783 F.3d 1328 (D.C. Cir. 2015) ..................................................................12

*Abbas v. Foreign Policy Grp., LLC.,*
   975 F. Supp. 2d 1 (D.D.C. 2013), *aff'd* 783 F.3d 1328 (D.C. Cir. 2015) ..........................12, 17

*Abhe & Svoboda, Inc. v. Chao,*
   508 F.3d 1052 (D.C. Cir. 2007) ..................................................................12

*Am. Petroleum Inst. v. Technomedia Int'l, Inc.,*
   699 F. Supp. 2d 258 (D.D.C. 2010) ..............................................................25

*Atherton v. District of Columbia,*
   567 F.3d 672 (D.C. Cir. 2009) ....................................................................11

*Beeton v. Dist. of Columbia,*
   779 A.2d 918 (D.C. 2001) ..........................................................................13

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ..................................................................................11

*Browning v. Clinton,*
   292 F.3d 235 (D.C. Cir. 2002) ....................................................................25

*Carey v. Piphus,*
   435 U.S. 247 (1978) ..................................................................................14

*Clyburn v. News World Commc'ns, Inc.,*
   903 F.2d 29 (D.C. Cir. 1990) ......................................................................17

*Connaughton v. Harte Hanks Commc'ns, Inc.,*
   842 F.2d 825 (6th Cir. 1988), *aff'd,* 491 U.S. 657 (1989) ...............................21

*EEOC v. St. Francis Xavier Parochial Sch.,*
   117 F.3d 621 (D.C. Cir. 1997) ....................................................................12

*Franklin v. Pepco Holdings, Inc. (PHI),*
   875 F. Supp. 2d 66 (D.D.C. 2012) ..............................................................14

*Glob. Van Lines, Inc. v. Kleinow,*
   411 A.2d 62 (D.C. 1980) ............................................................................23

*Harte-Hanks Comm., Inc.,*
   491 U.S. 657 (1989) ............................................................................17, 21, 22

*Henthorn v. Dep't of Navy,*
   29 F.3d 682 (D.C. Cir. 1994) ......................................................................12

*Herbert v. Lando,*
  441 U.S. 153 (1979) .................................................................................................. 17

*Jankovic v. Int'l Crisis Grp.,*
  494 F.3d 1080 (D.C. Cir. 2007) ............................................................................... 14

*Klayman v. Segal,*
  783 A.2d 607 (D.C. 2001) ........................................................................................ 15

*Kowal v. MCI Commc'ns Corp.,*
  16 F.3d 1271 (D.C. Cir. 1994) ................................................................................. 11

*Levy v. American Mutual Ins. Co.,*
  196 A.D. 475 (D.C. 1964) ........................................................................................ 14

*Mattiaccio v. DHA Grp., Inc.,*
  908 F. Supp. 2d 136 (D.D.C. 2012) ......................................................................... 25

*McFarlane v. Ben-Menashe,*
  24 Media L. Rep. 1049 (D.D.C. 1995) ..................................................................... 18

*Messina v. Fontana,*
  260 F. Supp. 2d 173 (D.D.C. 2003) ......................................................................... 13

*Moldea v. New York Times Co.,*
  15 F.3d 1137 (D.C. Cir. 1994) ................................................................................. 14

*New York Times Co. v. Sullivan,*
  376 U.S. 254 (1964) .................................................................................................. 17

*Pacquiao v. Mayweather,*
  803 F. Supp. 2d 1208 (D. Nev. 2011) ...................................................................... 14

*Perk v. Reader's Digest Ass'n, Inc.,*
  931 F.2d 408 (6th Cir. 1991) .................................................................................... 21

*Roman v. Nat'l Reconnaissance Office,*
  2013 WL 3388391 (D.D.C. July 9, 2013) ................................................................ 11

*S. Air Transp., Inc. v. Am. Broad. Companies, Inc.,*
  877 F.2d 1010 (D.C. Cir. 1989) ............................................................................... 14

*Saint-Jean v. District of Columbia,*
  846 F. Supp. 2d 247 (D.D.C. 2012) ......................................................................... 25

*St. Amant v. Thompson,*
  390 U.S. 727 (1968) .................................................................................................. 17

*Tavoulareas v. Piro,*
  93 F.R.D. 11 (D.D.C. 1981) ..................................................................................... 24

*Tavoulareas v. Piro,*
  759 F.2d 90 (D.C. Cir. 1985) ........................................................................ 22, 23, 25

*Tavoulareas v. Piro*,
   817 F.2d 762 (D.C. Cir. 1987) ...................................................................17, 21, 22

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
   592 F.3d 954 (9th Cir. 2010) ..................................................................................12

*White v. Fraternal Order of Police*,
   707 F. Supp. 579, 596 (D.D.C. 1989) ....................................................................16

*White v. Fraternal Order of Police*,
   909 F.2d 512 (D.C. Cir. 1990) ...............................................................................14

*Whiting v. AARP*,
   637 F.3d 355 (D.C. Cir. 2011) ..........................................................................12, 13

## **Statutes**

Fed. R. Civ. P. 12(b) .......................................................................................................12, 13

Fed. R. Evid. 201(b)(2) ..........................................................................................................13

## **Miscellaneous**

Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick,
   THE LAW OF TORTS § 520 (2d ed.) .........................................................................23

Plaintiff Ryan Howard ("Howard") respectfully submits this consolidated memorandum in opposition to the motions to dismiss the First Amended Complaint ("FAC") by Defendants Al Jazeera America, LLC, Al Jazeera Media Network, Al Jazeera International (USA) Inc. (together, "Al Jazeera Defendants"), Deborah Davies, and Liam Collins (ECF Nos. 25, 27).

## INTRODUCTION

In December 2015, Defendants published a sensationalized documentary entitled "The Dark Side:  Secrets of the Sports Dopers" that purported to investigate the supply chain of illicit performance enhancing drugs for elite athletes.  Included in this news video on "Sports Dopers" were statements that Howard, a Major League Baseball ("MLB") player, took a substance called "Delta 2," which MLB has banned.  These statements were false.  The man who made these statements, indeed, the sole source of the fiction that Howard took Delta 2, one Charles Sly, publicly recanted them before Defendants published "The Dark Side."  Yet, knowing that Sly recanted, and in the face of other obvious red flags of falsity detailed below, Defendants nonetheless published this fiction to enhance the notoriety of their report by appearing to "bag" a high-profile athlete like Howard and to drum up  ratings for the then crumbling and now defunct Al Jazeera America network.  "The Dark Side" has indeed become notorious as Defendants had hoped, but as a symbol of shoddy journalism and sensationalism as opposed to suitable reportage.

Defendants now attempt to dodge culpability for their misconduct by invoking the First Amendment as the basis for their motions to dismiss Howard's FAC.  Confronted with their failure to examine the veracity of Sly's false statements despite having serious reasons to doubt them, Defendants seek to disassociate themselves from the statements by contending that they did not make or endorse them, but merely reported them.  They further claim that they failed to appreciate the falsity of the statements and so did not act with malice.  Such arguments fail.  The

statements constitute defamation chargeable to Defendants because a reasonable viewer of the documentary could understand from it that *Defendants* were asserting that Howard took performance-enhancing drugs, not merely that he had been accused of doing so by someone else. Further, Howard's specific allegations about Defendants' conduct and motives amply support his claim that Defendants knew or should have known that Sly's statements about Howard were false and thus acted with malice in broadcasting them. As to Defendant Collins, his separate argument that his actions—secretly filming sources under the guise of obtaining banned substances for his own use—do not qualify as publication is contrary to case law, which requires only some degree of participation in the preparation of the publication.

In sum, Howard's FAC is deeply seeded with serious allegations that Defendants published what they knew or recklessly avoided knowing were damaging falsehoods about Ryan Howard in order to generate sensationalism and profit. Those allegations must be accepted as true at the pleading stage, and they compel the denial of Defendants' motions to dismiss, because the First Amendment does not protect a publisher that broadcasts defamatory material with knowledge or reckless disregard of its falsity. Even public figures can object to and obtain redress for such egregious conduct. Howard must be afforded that opportunity here.

## FACTUAL BACKGROUND

### A.     Plaintiff Ryan Howard

Plaintiff Ryan Howard is a highly successful professional baseball player, and the starting first baseman for the Philadelphia Phillies ("Phillies"). *See* ECF No. 10 at ¶ 14. Howard has played for the Phillies for his entire thirteen-year MLB career, after being drafted by the Phillies in the fifth round of the 2001 MLB draft. *See id.* ¶¶ 14, 16. Prior to being drafted by the Phillies, Howard attended and graduated from Lafayette High School in Wildwood, Missouri, and went on to attend Missouri State University, where he walked-on to the school's baseball

team.  *Id.* ¶ 15.  After his on-field performance excelled, Howard was awarded a scholarship and became a permanent fixture in the lineup.  *Id.*  Missouri State retired Howard's number on December 18, 2010, and he was inducted into its Hall of Fame in February 2016.  *Id.*

Howard was first called up to the major leagues in September 2004 and it did not take long before he achieved great on-field success.  *Id.* ¶ 16.  In 2005, Howard won the National League ("NL") Rookie of the Year ("ROY") Award.  *Id.*  The following year, Howard won the NL Most Valuable Player ("MVP") Award, making him one of only three players in MLB history to win ROY and MVP in consecutive seasons.  *Id.*

In 2006, in addition to being named MVP, Howard was selected to his first All-Star team and won the annual Home Run Derby.  *Id.* ¶ 17.  Howard also received the NL Hank Aaron Award, which is awarded to the best hitter in the league, as voted on by baseball fans and members of the media, and he won the Silver Slugger Award as the best offensive player at the first base position.  *Id.*  He was further named both The Sporting News Player of the Year and the Player of the Year in the 2006 Players Choice Awards balloting.  *Id.*  The Philadelphia Sports Hall of Fame awarded Howard the Pride of Philadelphia Award for the year.  *Id.*

Howard's 2006 home run total made him one of only 27 MLB players in history to have hit more than 50 home runs in a season.  *Id.* ¶ 18.  His 58 home runs remain the highest single season total for any MLB player since 2001, and the highest total of all time for the Phillies.  *Id.*

In 2009, Howard became only the fourth player in MLB history to amass at least 135 runs batted in and 45 home runs in four consecutive seasons.  *Id.* ¶ 19.  Howard was again named to the NL All-Star team in both 2009 and 2010.  *Id.*  In 2014, Howard became the MLB record-holder for having reached 1,000 runs batted in in the shortest career timespan.  *Id.*

Howard's achievements have not only earned him individual accolades, but also have

contributed to great team success for the Phillies.  *Id.* ¶ 20.  In 2007, the Phillies made the playoffs for the first time in 14 years, winning their first of five consecutive NL East titles.  *Id.* Howard was an instrumental part of the Phillies winning the 2008 World Series—only the second in team history—and he was named the MVP of the 2009 NL Championship Series.  *Id.*

In addition to his outstanding athleticism, Howard is known for his willingness to give back to the community. *Id.* ¶ 21.  He hosts numerous charity events in Philadelphia and has founded multiple charities aimed at helping youth.  *Id.*  Additionally, in 2009, Howard formed the Ryan Howard Family Foundation ("Family Foundation").  *Id.* ¶ 22.  The Family Foundation provides grants to select nonprofits that are aligned with its mission to improve the lives of disadvantaged youth and families, with a focus on programs that advance education, nutrition, physical fitness, and socio-economic status. *Id.*

Howard and his wife also founded the Ryan Howard Big Piece Foundation ("Big Piece Foundation"), a Section 501(c)(3) organization dedicated to improving the lives of children by promoting academic and athletic development.  *Id.* ¶ 23.  The Big Piece Foundation's goal is to engage students in the essential area of literacy, leading them on a path to a brighter future.  *Id.* For example, during the 2013-2014 school year, the Big Piece Foundation partnered with Vare-Washington Elementary School in Philadelphia to complete Ryan's Reading Challenge, a kindergarten through third-grade literacy program challenging students to read 20 minutes a day, seven days a week.  *Id.* ¶ 24.  In conjunction with the challenge, the Big Piece Foundation awarded the school a $75,000 academic grant to build Howard's Homeroom, an interactive, baseball-themed reading room filled with hundreds of books, computers, and iPads.  *Id.*

Based on Howard's reputation and the foundations' missions, the Big Piece Foundation and the Family Foundation have numerous corporate partners, including Shop-Rite, Citizens

Bank, Mitchell & Ness, Subway, American Broadcasting Company, Apollo Jets, The Cake Boss, ICONIX, Moroccan Hair Oil, and Morton's Steakhouse.  *Id.* ¶ 25. Due to his reputation as a talented and widely respected athlete, Howard has endorsed and acted as spokesman for numerous domestic and international companies.  *Id.* ¶ 27.

### B.      The Al Jazeera Defendants

Al Jazeera Media Network is a Qatar-based news network that is owned or funded by the government of Qatar.  *Id.* ¶ 28.  Originally launched as an Arabic-language cable channel, Al Jazeera Media Network has expanded into a multi-channel network.  *Id.*  In 2013, Al Jazeera Media Network moved into the American news market by acquiring Current TV for $500 million and launching Al Jazeera America.  *Id.* ¶ 29.  Al Jazeera America, however, was "plagued with low ratings" and leadership instability.  *Id.*  In or about May 2015, Al Jazeera America suffered "an exodus of top executives" who left the network citing "a culture of fear" and a "newsroom in total disarray behind the scenes."  *Id.* ¶ 30.  As a result of this exodus, as well as a $15 million discrimination lawsuit against the network, Al Jazeera America "nearly imploded," and then-CEO Ehab Al Shihabi was removed from his position.  *Id.*

Al Shihabi's removal did little to solve Al Jazeera America's troubles.  *Id.* ¶ 31.  Instead, the network's troubles continued with the departure of its Senior Vice President of News Output in August 2015.  *Id.*  In September 2015, Al Jazeera America spurred on a labor dispute when it refused to voluntarily recognize a union drive announced by its digital employees.  *Id.*  And when ratings were released later that month, Al Jazeera America continued to trail far behind its competitors.  *Id.* ¶ 32.  In November 2015, Al Jazeera America was forced to suspend its general counsel after it was revealed that he was not licensed to practice law.  *Id.* ¶ 33.  Al Jazeera America's troubles ultimately resulted in the January 13, 2016 announcement that it would cease operations in April 2016.  *Id.* ¶ 34.

### C.      The Dark Side: Secrets of the Sports Dopers

Only weeks prior to the announcement that Al Jazeera America would cease operating, and in the midst of internal turmoil and the need to promptly reverse its unsustainable ratings profile, Defendants released the documentary that is the subject of this lawsuit.  On Sunday, December 27, 2015, Al Jazeera America aired "The Dark Side: Secrets of the Sports Dopers," *id.* ¶ 40, a title Defendants transparently designed to entice viewers to tune-in to a broadcast that would finger "top athletes" involved in illegal doping.  No later than December 27, 2015, the Al Jazeera Defendants posted on its website a news article describing "The Dark Side" and including an embedded link to a video of the full program.  *Id.*  A day before the televised airing of "The Dark Side," Al Jazeera posted a video of the full program on YouTube, and provided it to The Huffington Post, which published an article with an embedded link to the full program on Saturday, December 26, 2015.  *Id.* ¶ 41.

"The Dark Side" was the work of Al Jazeera's so-called Investigative Unit, of which Defendant Davies was a part.  *Id.* ¶ 36.  Davies was the lead reporter on the piece (*id.* ¶¶ 36, 40), and the investigation started with the recruitment of Defendant Collins to work for Al Jazeera "undercover by claiming to be an athlete desperate to qualify for the Rio Olympics."  *Id.* ¶ 42. At the time Al Jazeera recruited Collins, Collins had a reputation as a known fraudster and publicity-seeker who gained fame in 2009 as a semi-finalist on Britain's Got Talent as part of the dance duo "Faces of Disco."  *Id.* ¶ 37.  Collins later sought publicity to raise money for a supposed attempt to join an Olympic bobsled team and a never-materialized bid to buy Michael Jackson's Neverland Ranch.  *Id.*  In 2012, Collins and his business partner declared bankruptcy after their real estate investment scheme was exposed and investors lost millions.  *Id.* ¶ 38. British authorities barred Collins and his partner from directing companies within the United Kingdom for 14 years, concluding they had amassed a million pounds from investors "'with the

promise of high returns on property investments with no reasonable expectation that they would ever be able to meet the repayments promised to investors.'" *Id.*

Relying on Collins—who has no known journalistic training or news gathering experience—to do the legwork for "The Dark Side," Al Jazeera sought to find suppliers of performance-enhancing drugs. *Id.* ¶ 43. Collins reportedly spent eight months undercover traveling to the Bahamas, Canada, and Texas, attempting to make contact with suppliers of performance-enhancing substances by falsely claiming to be a potential client. *Id.* Collins then would induce his target to discuss the topic of performance-enhancing substances and to provide him with what were purported to be performance-enhancing substances. *Id.* Using hidden cameras, Collins secretly recorded these interactions. *Id.*

During several of these interactions, Collins meets with two doctors in Canada in his unrelenting quest to identify "high profile" athletes on the "dark side." It is in the course of these interactions that Collins first learns of Sly, who is identified as a "genius" doping supplier capable of "outwitting [the World Anti-Doping Agency]" and "tak[ing] drugs to a new level." ECF No. 27-4 at 13-14. From the outset, Defendants establish Sly as the kingpin of the sports doping world, casting every athlete named by Sly to be a doper on "the dark side." The narrator states that Sly is "someone we need to meet" (*id.* at 14), and therefore, sends Collins to Austin, Texas to meet with Sly in an attempt to entice Sly into identifying the "high profile" athletes that Defendants needed to make their documentary newsworthy.

### D.    The Defamatory Statements Contained In "The Dark Side"

Shortly after Sly's initial meeting with Collins, Sly was captured on a concealed camera in Collins' hotel room in Austin, Texas offering Collins a steroid called "Delta 2" or "D-2." ECF No. 10 at ¶ 45. In the video, Sly tells Collins that the Delta 2 will help him with his "strength gains." *Id.* As part of his sales pitch to Collins, Sly claims: "There's a bunch of

football players who take this, and a bunch of baseball players take it too.  It was recently added to the MLB banned list." *Id.*  A voiceover from Davies further explains: "Major League Baseball added Delta 2 by name, but as a steroid it was already banned in baseball and football." *Id.*  Although Collins declines Sly's offer to take samples of Delta 2, Al Jazeera failed to include this footage in the documentary.

Later in the program, Collins returns to Texas for a road trip with Sly during which Collins pressures Sly to identify high profile athletes purportedly linked to Delta 2.  As described by Davies in the program:

> Back in Texas, the pharmacist Charlie Sly names more sportsmen he claims are linked to Delta 2, in baseball and football.  He says he coached them on what to take and how to avoid testing positive. In a series of conversations crisscrossing Texas, we primed Liam [Collins] with questions to dig into the claims.

*Id.* ¶ 46.  During the footage of this road trip, the video cuts to a stylized clip of Howard running the bases in his uniform, with an announcer's voiceover, "[t]hat is well hit, it is way back, 50 home runs for Ryan Howard," before the shot comes to rest on a backdrop of a stylized baseball card of Howard, with his name appearing in large letters.  *Id.* ¶ 47.  Against this backdrop, the following conversation is played while the text of the conversation scrolls across the screen:

> Collins: So with the likes of Howard, once you've set him off, is there like a maintenance thing?

> Sly: He's somebody that you cannot overwhelm with stuff. You just make sure you have everything in bags. He knows to take stuff twice a day. Usually I just have him like teach it back to me.

> Collins: What did he notice in his hitting?

> Sly: With the D-2?

> Collins: Yeah

> Sly: I think maybe just some more explosiveness. He had a couple of years where he had a ton of home runs.

*Id.* Defendants further sensationalized these salacious allegations by interposing images of vials and syringes throughout the documentary and asserting that "many other top players" take Delta 2, all of which convey to the viewers that Howard is a "sports doper" "on the dark side."

      **E.**      **Defendants' Disregard For The Truth Of The Statements About Howard**

      Defendants' statements reporting that Howard used Delta 2 and human growth hormone are categorically untrue. *Id.* ¶ 50. Howard has never taken Delta 2, human growth hormone, or any other steroid or performance-enhancing substance banned by the MLB. *Id.* Howard has never received any banned substances from Charlie Sly or "taught anything back to" Charlie Sly. *Id.* Howard has never "been coached [by Charlie Sly] on what to take and how to avoid testing positive." *Id.* And, contrary to what is implied in the program, Charlie Sly played no part in Howard's fiftieth home run in 2006 or in any of his many other home runs. *Id.*

      The facts indicate that Defendants knew or had reason to know that the statements concerning Howard were untrue at the time they published them. On or about December 9, 2015, Howard first learned that Al Jazeera planned to run a program accusing him, and others, of taking illegal or banned supplements. *Id.* ¶ 53. On December 18, 2015, Howard's counsel informed Al Jazeera's then-counsel, who has since withdrawn his appearance on behalf of Al Jazeera (*see* ECF No. 30), that Howard "unequivocally and emphatically den[ies]" using or having used Delta 2 or any other performance-enhancing drugs and that such defamatory claims, if published, would cause Howard serious reputational and economic injury. *Id.* Counsel for Howard also noted that Al Jazeera's refusal to identify the lone source of its claims prevented discovery of the truth because Howard could have shown the "source is either untrustworthy or just plain wrong." *Id.* On December 23, 2015, counsel for Howard again wrote to Al Jazeera's former counsel, re-affirming that Howard "unequivocally and emphatically denies that he used Delta 2 or any other performance-enhancing drug" and that publication of such claims would be

defamatory, and demanding that "Al Jazeera immediately cease and desist from making false and injurious statements" about Howard.  *Id.* ¶ 54.

On December 26, 2015, Howard learned (from a source other than Defendants) that Sly was Al Jazeera's source and that Sly had unequivocally advised Davies and Al Jazeera's counsel, in writing, that the purported statements were false.  *Id.* ¶ 55.  Howard's counsel again wrote to Al Jazeera's former counsel, noting that, in light of the above facts and especially given Collins' reputation as a fraudster and attention-seeker, "[t]here can be no conclusion but that the sources for Al Jazeera's statements regarding Mr. Howard's alleged use of performance-enhancing drugs are patently unreliable," and again demanded that Al Jazeera cease and desist.  *Id.*

Nonetheless, on this same day, in an obvious ploy to drum up publicity in advance of airing the program on its network and to increase its ratings, Al Jazeera posted the full program on YouTube and provided The Huffington Post with an advance copy.  *Id.* ¶ 56.  At 9:01 p.m. on December 26, 2015, The Huffington Post published a story relating to "The Dark Side: Secrets of the Sports Dopers," and embedded in this story not only a link to the video of the full program, but also a video of Sly recanting his statements.  *Id.*

In his 55-second long video recantation, Sly clearly states:

> The statements on any recordings or communications that Al Jazeera intends to air are absolutely false and incorrect.  To be clear, I am recanting any such statements and there is no truth to any statement of mine that Al Jazeera plans to air.  Under no circumstances should any of those statements, communications, or recordings be aired.

*Id.* ¶ 54.  In this same article, The Huffington Post further reported that "[i]n a subsequent statement to Al Jazeera, [Sly] walked back the comments even further."[1]  *Id.*

---

[1]  Al Jazeera has not made this subsequent statement public.  *Id.*

F.      **The Instant Lawsuit**

As a result of Defendants' defamatory statements, Howard was at the center of a media storm speculating as to his alleged use of Delta 2 and other performance-enhancing substances. *Id.* ¶ 68.   Howard's reputation for honesty, both generally and as a competitor, has been called into question, not only in front of the athletic community, but in front of the public at large.  *Id.* As a result, Howard has suffered reputational harm that has affected and will continue to affect him in his main profession—as a professional baseball player—as well as in future sponsorship and other business opportunities and in charitable pursuits.  *Id.*  On January 5, 2016, Howard sued the now-defunct Al Jazeera America, as well as Davies and Collins, for defamation and false light.  *See* ECF No. 1.   An Amended Complaint added Defendants Al Jazeera Media Network and Al Jazeera International (USA) Inc.  *See* ECF No. 10.

The Al Jazeera Defendants, along with Davies, collectively filed a motion to dismiss on April 8, 2016.  *See* ECF Nos. 24, 27.  Collins separately filed a motion to dismiss that same day, incorporating the arguments of the other Defendants.  *See* ECF No. 25

## STANDARD OF REVIEW

When considering a motion to dismiss, "a judge must accept as true all of the factual allegations contained in the complaint," *Atherton v. District of Columbia*, 567 F.3d 672, 681 (D.C. Cir. 2009), and grant a plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).   A complaint need contain only "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   "A claim is facially plausible when the facts of the complaint will allow the court to make a reasonable inference that the defendant is liable for the alleged misconduct." *Roman v. Nat'l Reconnaissance Office*, 2013 WL 3388391, at *2 (D.D.C. July 9, 2013).  Claims for defamation or false light invasion of privacy are governed

by the typical framework for evaluating a Rule 12(b)(6) motion to dismiss.  *See Abbas v. Foreign Policy Grp.*, LLC, 783 F.3d 1328, 1333 (D.C. Cir. 2015) (holding federal court exercising diversity jurisdiction "must apply those Federal Rules [governing a motion to dismiss] instead of the D.C. Anti–SLAPP Act's special motion to dismiss provision").

Additionally, on a Rule 12(b)(6) motion to dismiss, the court is limited to considering facts alleged in the complaint, any documents either attached to or incorporated in the complaint, and matters of which the court may take judicial notice.  *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  Although the court may take judicial notice of material on a motion to dismiss, the matters to be noticed must be relevant and properly subject to judicial notice.  *See, e.g.*, *Whiting v. AARP*, 637 F.3d 355, 364 (D.C. Cir. 2011); *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007); *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (news articles and web pages only subject to judicial notice to "indicate what was in the public realm at the time, not whether the contents of those articles were in fact true").  Factual allegations in briefs or memoranda of law may not be considered, particularly when the facts they contain contradict those alleged in the complaint.  *See Henthorn v. Dep't of Navy*, 29 F.3d 682, 688 (D.C. Cir. 1994).

## ARGUMENT

Defendants do not – and cannot – argue as a defense that the statements in the documentary that Howard took Delta 2 are true.  Instead, Defendants seek to dismiss the claims for libel and false light invasion of privacy on the ground that the statements were not defamatory or "false statements of fact" and that Defendants did not act with actual malice.  Separately, Defendant Collins argues that he did not publish the statements.  None of these arguments can succeed.  Howard has alleged facts more than sufficient to meet the plausibility

standard for his libel and false light claims.[2]  This Court should, therefore, deny Defendants'
motions to dismiss.

## I.   HOWARD HAS SUFFICIENTLY ALLEGED THE DEFAMATORY MEANING AND ACTUAL MALICE ELEMENTS OF HIS LIBEL AND FALSE LIGHT INVASION OF PRIVACY CLAIMS

A plaintiff who is a public figure will establish a claim for libel if he can show (1) that
the defendant made a false and defamatory statement concerning the plaintiff; (2) that the
statement was published without privilege to a third party; (3) that the defendant published the
statement with actual malice; and (4) either that the statement was actionable as a matter of law
irrespective of special harm or that its publication caused the plaintiff special harm.  *See Messina
v. Fontana*, 260 F. Supp. 2d 173, 176-77 (D.D.C. 2003); *see also Beeton v. Dist. of
Columbia*, 779 A.2d 918, 923 (D.C. 2001).   None of the Defendants challenge that the
statements harmed Howard and only Collins challenges the fact of publication.

### A.   The Amended Complaint Adequately Alleges That Defendants Defamed Howard

Defendants' first argument in support of dismissal is that they did not make a defamatory
statement.   They do not contend that an accusation that Howard used performance enhancing
drugs is not defamatory.[3]  Rather, they claim that, viewed in its entirety, their documentary did

---

[2]   Defendants, in particular the Al Jazeera Defendants and Davies, wrongly seek to rely upon a variety of news articles and facts contained in similar sources that are irrelevant and not properly the subject of judicial notice.  This Court should decline to take judicial notice of these purported facts.  Such materials are irrelevant to the Rule 12(b) motion to dismiss.  *See Whiting*, 637 F.3d at 364 (holding "Senate Finance Committee materials are irrelevant to disposition of the motion to dismiss, which turns on the adequacy of the well-pleaded factual allegations in the complaint, which are assumed to be true").  Further, it is not the case that the facts for which Defendants seek judicial notice are "not subject to reasonable dispute because [they] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2), making judicial notice inappropriate.

[3] Any such argument would be frivolous, as accusing an athlete of taking performance enhancing drugs both charges a crime and undermines the athlete's professional reputation.  *See, e.g.,*

not accuse Howard of using performance-enhancing drugs, but merely reported that Sly had done

so and "raised questions" concerning Sly's allegation.  This argument should be rejected.

When a defendant seeks dismissal of a defamation claim on the ground that a statement

alleged to be defamatory was not, the Court's task is to assess whether the challenged statement

is reasonably susceptible of the defamatory meaning the plaintiff alleged.  The inquiry at the

pleading stage is not whether or to what extent third-parties actually understood the statement as

defamatory but simply whether they *could* have.  *See Moldea v. New York Times Co.*, 15 F.3d

1137, 1142 (D.C. Cir. 1994) ("[T]he defamatory meaning inquiry focuses only on whether a

reasonable reader could understand a statement as tending to injure a plaintiff's reputation.").

"'It is only when the court can say that the publication is not reasonably capable of any

defamatory meaning and cannot be understood in any defamatory sense that it can rule as a

matter of law, that it was not libelous.'"  *White v. Fraternal Order of Police*, 909 F.2d 512, 518

(D.C. Cir. 1990) (quoting *Levy v. American Mutual Ins. Co.*, 196 A.D. 475, 476 (D.C. 1964)).  A

court concluding that a challenged statement could reasonably be understood as defamatory must

permit a defamation claim to go forward even if it concludes that the statement could also have

been reasonably interpreted in a non-defamatory way.  In such cases, the fact finder must be

allowed to determine which interpretation prevailed in the minds of the audience.  *See S. Air*

*Transp., Inc. v. Am. Broad. Co., Inc.*, 877 F.2d 1010, 1014 (D.C. Cir. 1989).  When considering

---

*Franklin v. Pepco Holdings, Inc. (PHI)*, 875 F. Supp. 2d 66, 75 (D.D.C. 2012) ("Defamation as a
matter of law generally consists of false statements that impute to the subject a crime, a
repugnant disease, a matter adversely affecting the person's ability to work in a profession, or
gross sexual misconduct.") (citing *Carey v. Piphus*, 435 U.S. 247, 262 (1978)); *Jankovic v. Int'l
Crisis Grp.*, 494 F.3d 1080, 1091 (D.C. Cir. 2007) ("A statement is 'defamatory' if it tends to
injure the plaintiff in his trade, profession or community standing, or lower him in the estimation
of the community."); *Pacquiao v. Mayweather*, 803 F. Supp. 2d 1208, 1213 (D. Nev. 2011)
(finding that plaintiff professional boxer "sufficiently alleged a cause of action for defamation
per se" based on statements by defendants that boxer was using and had used performance
enhancing drugs).

whether a statement could reasonably be construed as defamatory, a court should view it in the context in which it was published. *See Klayman v. Segal*, 783 A.2d 607, 614 (D.C. 2001).

With these standards in mind, the question posed by Defendants' motion to dismiss, which must be answered affirmatively for Defendants' to prevail, is this:  Can the Court say with positive assurance that no reasonable person watching the documentary – titled "Secrets of the Sports Dopers" and depicting a person described as a "chemical mastermind" asserting that he supplied Howard with performance enhancing drugs – could have understood Defendants to be accusing Howard of having taken performance enhancing drugs?

Defendants urge the Court to answer affirmatively because, purportedly, "[n]owhere in the Documentary or follow-up articles does Al Jazeera endorse Sly's or Robertson's claims or take a position on the truth of those assertions."  ECF No. 27-1 at 22.  But that "argument" is just a conclusory restatement of Defendants' position that does no more than beg the question.  It does not purport to explain *why* a person viewing the documentary could not reasonably have understood it to convey that Defendants endorsed Sly's accusations against Howard, much less definitively establish that premise so as to warrant dismissal of the FAC.

Defendants' sole explanatory argument is that "the Documentary makes clear that the statements that Sly and his partners made about working with professional athletes are only 'claims'" by using phrases in the narration such as "medical professionals who *say* they work with top athletes" and "Sly named more sportsmen he *claims* are linked to Delta 2."  *Id.* (emphasis in original).  A speaker, however, can hardly relay the words of another without using some verb to convey that the words were uttered.  The fact that defendants chose "said" and "claimed" when they published Sly's words, instead of "stated", "asserted", or "declared", hardly proves that a viewer could not have understood Defendants to be reporting the statements as

15

truth.  Indeed, if all a publisher had to do to avoid liability for defamation was insert the word "claim" before a falsehood, the tort of defamation would be effectively gutted.  *See White v. Fraternal Order of Police*, 707 F. Supp. 579, 596 (D.D.C. 1989) ("The common law rule in this jurisdiction is that [t]he law affords no protection to those who couch their libel in the form of reports or repetition . . . . [T]he repeater cannot defend on the ground of truth simply by proving that the source named did, in fact, utter the statement.") (internal quotations ommitted)).

Moreover, Defendants ignore the fact that *the bulk of the documentary was devoted to trying convince the viewer that Sly's statements about supplying performance enhancing drugs to athletes were credible*, including by showing Sly providing performance enhancing drugs to Collins (ECF No. 27-4 at 14-15), showing Sly providing performance enhancing drugs to MLB player Taylor Teagarden (*id.* at 23-24), showing a respected endocrinologist corroborate Sly's statements about the appropriate uses of a performance enhancing drug (*id.* at 32-33), and showing Sly stating that he did not give performance enhancing drugs to a particular high profile athlete, in an effort to demonstrate that Sly's statements were not pure puffery (*id.* at 30). Defendants, in fact, point to nothing in the documentary that called Sly's credibility into question, save for a passing mention that he had recanted his surreptitiously-recorded statements, a recantation that Davies pooh-poohed in an interview published alongside the documentary, in which she rhetorically asked "is he lying now [with his recantation], [or] was he lying during day upon day upon day of undercover filming . . . ."  ECF No. 27-5 at 2.

Plaintiff respectfully submits that Defendants' claim that they made no accusation against Howard but merely reported accusations by Sly and "left the viewer to draw his or her own conclusions" (ECF No. 27-1 at 23) is a *post hoc* effort to avoid responsibility.  As the Court will see when it views the documentary, the obvious (and false) thrust of the documentary is that Sly

was telling the truth when he accused Howard and others of taking performance-enhancing drugs.  At the very least, it cannot be definitively said that no reasonable viewer could have interpreted the documentary in that way.  Accordingly, Defendants' argument that the FAC should be dismissed for failure to allege a defamatory statement by them must be rejected.[4]

### B.   The Amended Complaint Adequately Alleges That Defendants Acted With Knowledge Of Probable Falsity Or Reckless Disregard For The Truth

One who publishes a statement knowing it is false or with reckless disregard for its falsity is said to act with "actual malice." *See New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964).  Recognizing that such malefactors rarely memorialize their bad intentions, courts permit plaintiffs to prove actual malice by relying upon circumstantial evidence.  *See Harte-Hanks Comm., Inc.*, 491 U.S. 657, 668 (1989); *see also Tavoulareas v. Piro*, 817 F.2d 762, 795 (D.C. Cir. 1987) (en banc) ("[A] plaintiff may prove the defendant's subjective state of mind through the cumulation of circumstantial evidence, as well as through direct evidence.").  For example, awareness of probably falsity may be found if there are obvious reasons to doubt the veracity of an informant or the accuracy of the source's reports.  *See Herbert v. Lando*, 441 U.S. 153, 156-57 (1979); *see also St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) (holding "obvious [specified] reasons to doubt the veracity of the informant or the accuracy of his reports" could result in finding of actual malice); *Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29, 33 (D.C. Cir. 1990) (quoting *St. Amant*, 390 U.S. at 732).  Although "a failure to investigate,

---

[4] The case Defendants rely on for their argument on this point, *Abbas v. Foreign Policy Grp., LLC.*, 975 F. Supp. 2d 1, 7-8 (D.D.C. 2013), *aff'd* 783 F.3d 1328 (D.C. Cir. 2015), is not to the contrary.  In affirming the district court, the court of appeals noted that the plaintiff's defamation claim "focuses not on statements made in the article but rather on two questions posed in the article" and explained that "it is generally settled in defamation law . . . that a question, however unpleasant or embarrassing to its subject, is not an accusation."  783 F.3d at 1338.  Howard's FAC, by contrast, does not allege that Defendants merely questioned whether he had used performance enhancing drugs but that they affirmatively accused him of doing so by reporting Sly's statements to that effect and then attempting to bolster Sly's credibility.  As explained above, a viewing of the documentary bears this out.

standing alone, will not support a finding of actual malice . . . a duty to investigate arises where a publisher has obvious reasons to doubt the veracity of its informant."   *McFarlane v. Ben-Menashe*, 24 Media L. Rep. 1049, 1052 (D.D.C. 1995).

Here, Howard's allegations concerning (i) Defendants' knowledge that Sly had recanted his allegations against Howard before Defendants published them, (ii) Defendants' knowledge that Sly had an obvious motive to lie about Howard, (iii) Defendants' failure to investigate or corroborate Sly's statements as to Howard, and (iv) Defendants' motive and even need to generate a sensational story make out a plausible claim of malice that Howard, who is entitled to all favorable inferences, must be allowed to attempt to prove.

Beginning with the first of these points, Howard has alleged and Defendants have conceded that Sly fully and completely recanted his statements regarding Howard's supposed drug use and that they received Sly's recantation "before the Documentary was to be broadcast." ECF No. 27-1 at 17.  In a video Sly provided to Defendants, he unambiguously informed them that the statements by him that they planned to broadcast "are absolutely false and incorrect" and that he was "recanting such statements and there is no truth to any statement of mine that Al Jazeera plans to air."  ECF No. 10 at ¶ 57.  In an interview Al Jazeera posted on December 27, 2015, the same day it aired the documentary, Davies admitted that Defendants had heard from Sly "48 hours ago" and acknowledged that "Charlie Sly now says that anything he said to us wasn't true."  *Id.* ¶ 63.

In the aforementioned interview, Davies attempted to downplay Sly's recantation, observing that "[y]ou have to say, well, is he lying now [or] was he lying *during day upon day upon day of undercover filming*, because obviously the two don't square."  ECF No. 27-5 at 2 (emphasis added).  Davies' implication, repeated in Defendants' arguments to this Court, is that

Defendants (a) credited Sly's claims that he had provided drugs to Howard because he made them when he thought he was speaking privately and (b) discounted Sly's recantation because they believed Sly made it under duress and fear of liability. Defendants go so far as to argue that "Plaintiff alleges no plausible 'obvious reasons' why Al Jazeera should have doubted either Sly's general veracity or the truth of his statements about Plaintiff." ECF No. 27-1 at 31.

However, Defendants' *did* have an obvious reason to doubt Sly's veracity: Sly was engaged in an illegal business, that he could not lawfully advertise through legitimate means, speaking to someone (Collins) he believed to be a potential customer who could significantly expand the scope of his business. Defendants understood all of this about Sly. *See id.* at 12 ("[Sly's business partner] Robertson said that he hoped that Collins could introduce ProMed to European soccer stars."). Defendants further understood that Sly did not know he was being recorded and had no reason to believe that his statements could ever be repeated or that he could be held accountable for them. Given these facts, and affording Howard the favorable inferences he is entitled to at the pleading stage, it is at the very least plausible that Defendants understood or deliberately overlooked that Sly's claim that he supplied performance enhancing drugs to Howard was a lie uttered in what Sly believed to be a no-risk effort to impress a potential client. Indeed, the *New York Times* recognized this obvious motive for Sly to lie when it reviewed the documentary, observing that "Sly and the other characters appear to be slippery sorts, sweaty salesmen in search of another mark." ECF No. 10 at ¶ 59. In the same vein, it is at the very least plausible that, confronted with Sly's recantation, Defendants understood and ignored the fact that, having learned that his statements had been recorded and would be broadcast, Sly recanted because he knew they were false and feared that he would be sued for defamation by his targets if they were published. Again, at the pleading stage, Howard is entitled to this inference.

It is also relevant and probative of malice that Defendants published Sly's false statements concerning Howard even though they lack any specificity and are uncorroborated. "The Dark Side: Secrets of the Sports Dopers" does not identify when Howard is alleged to have started taking such performance-enhancing substances or for how long, or how he received and paid for the drugs. ECF No. 10 at ¶ 60. It does not include any details on when, where, or how Sly supposedly met Howard or how they communicated with each other. *Id.* One can only assume that this is because, despite eight months of undercover work, Defendants failed to uncover a single reported piece of evidence corroborating Sly's outlandish claims about Howard.[5] *Id.*

At the same time, easily obtainable facts cast doubt on the veracity of Sly and his account. ECF No. 10 at ¶ 61. While Davies refers to Sly as a "doctor of pharmacy" and "pharmacist," and "The Dark Side" credits him with working at the Guyer Institute in Indiana in 2011, public records reveal that in 2011 Sly was not licensed in Indiana as either a doctor of pharmacy or a pharmacist, but rather as a pharmacy intern, and that this intern's license expired on May 1, 2013. *Id.* Further, both Sly and Dr. Guyer have stated that Sly was not an employee of the Guyer Institute, but rather a short-term, unpaid intern. *Id.* Davies herself also admitted on *The Today Show* that Sly was at the Guyer Institute only as "part of his training, part of his rotation for pharmacy." *Id.* The combination of the lack of specificity and utter absence of evidence corroborating Sly's claims about Howard and the availability of readily available facts casting doubt on his credibility further support Howard's claim of malice.

*Finally*, and contrary to Defendants' arguments (ECF No. 27-1 at 33), Defendants'

---

[5] Defendants argue that "many things in the Documentary supported Sly's statements that he supplied [performance-enhancing drugs] to professional athletes," ECF No. 27-1 at 31, but none of these supposedly "supported" statements concerns Howard.

motive to use Howard's name to sensationalize their documentary as a means to increase ratings for their failing television channel is supportive of Howard's malice claim.  As alleged in the FAC, at the time Defendants' broadcast the documentary, Al Jazeera America had long been suffering from abysmal ratings and was in desperate straights, so desperate in fact that it folded just four months later.  Those facts easily support a reasonable inference that Defendants calculated that the consequences they risked by defaming Howard were preferable to allowing Al Jazeera's tailspin to continue unchecked.  Although a defendant's motive "is insufficient *by itself* to support a finding of actual malice," an improper motive may be considered "*under some circumstances*."  *Tavoulareas*, 817 F.2d at 795, 796 (emphases added).  The Supreme Court has explained that, while "a newspaper's motive in publishing a story . . . cannot provide a sufficient basis for finding actual malice," *Harte-Hanks*, 491 U.S. at 665, it may qualify as "circumstantial evidence which, when combined with other evidence, may amount to malice." *Perk v. Reader's Digest Ass'n*, *Inc*., 931 F.2d 408, 411 (6th Cir. 1991).

Contrary to Defendants' claim (ECF No. 27-1 at 37-38) their publication of Howard's denial that he used performance-enhancing drugs is not a silver bullet that defeats all of Howard's allegations supporting his malice claim and insulates Defendants from liability.  The "publication of a denial by the defamed subject does not absolve a defendant from liability for publishing knowing or reckless falsehoods [or] . . . in any way vitiate the value of the evidence that defendant published the charge with reckless disregard for truth or falsity." *Connaughton v. Harte Hanks Commc'ns, Inc.*, 842 F.2d 825, 837-38 n. 6 (6th Cir. 1988) (internal quotations omitted), *aff'd*, 491 U.S. 657 (1989); *see also Tavoulareas*, 817 F.2d at 831 n.42 (McKinnon, J., dissenting) ("The fact that [defendant] published [plaintiff's] denial . . . does not in any way vitiate the value of the evidence that [defendant] published the charge with reckless disregard for

21

truth or falsity . . . .   Surely the First Amendment does not prevent a finding of actual malice whenever a defendant publishes false defamatory statements accompanied by denials.").

Taken together, the allegations in the FAC support the plausible  inference—which must be drawn in Howard's favor on a motion to dismiss—that Defendants' published Sly's accusation that Howard took performance-enhancing drugs with at least reckless disregard of its probable falsity if not actual knowledge of probable falsity.   Although Defendants seek to dismiss the FAC as based "entirely on indirect and circumstantial allegations in contending that Defendants published with actual malice," ECF No. 27-1 at 30, such circumstantial evidence is sufficient to establish actual malice and thus necessarily meets the *Iqbal-Twombly* pleading standard.   And such reliance is expressly permitted by both Supreme Court and D.C. Circuit law. *See Harte-Hanks Comm., Inc.*, 491 U.S. at 668; *Tavoulareas*, 817 F.2d at 795.   The motions to dismiss for failure to plead that Defendants acted with actual malice should be denied.[6]

## II.   COLLINS PUBLISHED DEFAMATORY MATERIAL REGARDING HOWARD

Separately, Collins argues that the complaint against him should be dismissed because Howard has not adequately alleged that Collins "published" the defamatory material.  *See* ECF No. 25-1 at 7-9.   Howard, however, has alleged sufficient facts to satisfy the legal standard for publication as to Collins because Collins served as an integral part of the publication of the

---

[6] Collins argues that Howard has failed to adequately allege actual malice because Howard impermissibly attempts to "impute[]" actual malice from the other Defendants to Collins.  ECF No. 25-1 at 14.  Not only do the arguments in text apply as forcefully to Collins as to the other Defendants, but Howard alleges that Al Jazeera "primed [Collins] with questions to dig into the claims" that Howard used Delta-2 (ECF No. 10 at ¶ 46); that "Al Jazeera used [Collins] to 'help us to investigate doping in sport . . . [by] claiming to be an athlete desperate to qualify for the Rio Olympics" (*id.* ¶ 42); and that "Collins spent six months traveling to the Bahamas, Canada, and Texas, attempting to make contact with suppliers of performance enhancing substances" (*id.* ¶ 43).  Far from attempting to impute Al Jazeera's actual malice to Collins, Howard alleges that Collins, in his relentless attempt to satisfy his mandate of identifying "high profile" athletes on the "dark side," knowingly and actively participated in the publication of the documentary with the same degree of recklessness and malice that Al Jazeera displayed.  *See Tavoulareas*, 759 F.2d at 136 (defendant need only have "knowingly participated in publishing the defamation").

defamatory news video.

To be liable for defamation, a defendant need only have "*knowingly participated* in publishing the defamation." *Tavoulareas*, 759 F.2d at 136 (emphasis added); *see e.g.*, *Glob. Van Lines, Inc. v. Kleinow*, 411 A.2d 62, 64, n.4 (D.C. 1980) (recognizing case law "declar[ing] that everyone who takes part in the publication of a newspaper is charged with 'publication'" for purposes of a defamation claim); Dan B. Dobbs, et al., THE LAW OF TORTS § 520 (2d ed.) ("Anyone who participates in publication can be a publisher subject to liability for defamation.").

Collins' active participation and collaboration with Al Jazeera and Davies is emphasized throughout "The Dark Side." Within the *very first minute* of the documentary, Davies clearly establishes that she, Al Jazeera, and Collins worked together "[o]ver eight months" to expose "the secret world of doping." ECF No. 10, Ex. L at 1:06. Specifically, at the forty-nine second mark, a voiceover from Davies explains their mission: "Working with a British athlete [Liam Collins], we [Al Jazeera] infiltrate a network who claim their scientific expertise can cheat the system." *Id.* at 0:55. Minutes later, Davies states that "we [Al Jazeera] had a proposal [for Collins]: help us to investigate doping in sport. He is perfectly placed to go undercover by claiming to be an athlete desperate to qualify for the Rio Olympics." *Id.* at 6:31. Throughout the documentary itself, which is an exhibit to the FAC that the Court may consider on a motion to dismiss, Collins' central role in the production and publication of the story is clear. *See e.g.*, *id.* at 7:02 ("*Our first task* was to test out Liam's cover story."); *id.* at 7:41 ("In Nassau, *we made an appointment for Liam* with the same doctor Tim says he went to."); *id.* at 7:58 ("In his bag, *our* hidden camera…"); *id.* at 11:04 ("*Our next step with Liam* was to see if his cover story would lead us to top level athletes on the dark side."); *id.* at 11:25 ("Over the next few months, our team worked on pinpointing people with possible connections to doping and *steering Liam towards*

them.”); *id.* at 18:35 (“*Our hidden cameras* are setup waiting for [Charlie Sly].”); *id.* at 23:35 (“*We've devised a cover story for a British Athlete, Liam Collins* that to qualify for the Olympics he is willing to cross to the dark side of sport and dope himself up.”); *id.* at 24:12 (“*Our hidden cameras* are setup.”); *id.* at 35:08 (“In a series of conversations crisscrossing Texas, *we primed Liam* with questions to dig into the claims.”); *id.* at 48:30 (“For me [Collins] it was just to finally drive the debate away from ‘Are they doing it?’ Then maybe we can finally evolve to the next and the most important part of the debate, what are we going to do about it?”).  And it was Collins himself who specifically sought to elicit information from Sly on Howard, directly asking Sly if Howard took Delta 2 and of its effects on Howard.

By surreptitiously working with Al Jazeera for eight months as an undercover “investigative reporter” for Al Jazeera, there can be no serious doubt that Collins knowingly participated in the publication of defamatory material about Howard.  At the very least, the allegation is plausible and therefore sufficient to withstand a motion to dismiss.

The cases Collins cites do not lead to a contrary conclusion.  For instance, in *Tavoulareas v. Piro,* 93 F.R.D. 11 (D.D.C. 1981), plaintiffs sued, among others, Katherine Graham of the Washington Post Company, for an allegedly libelous article that appeared in the *Washington Post.*  The D.C. Circuit agreed that the appropriate standard is low: only “*some* responsible participation is clearly a prerequisite to any potential liability of Mrs. Graham.”  *Id.* at 15 (citations omitted; emphasis added).  The court granted summary judgment in favor of Graham because the undisputed facts revealed that she was removed from the day-to-day operation of the newspaper and lacked general responsibility for the paper’s operation, such that her personal views were not reflected in the challenged article, especially since she had not participated in any form in preparing or publishing the article.  *Id.*  Here, by contrast, Collins was intimately

involved in the documentary, easily meeting the "some responsible participation" standard.  In addition, while the court in *Graham* granted summary judgment only because the plaintiff failed to show Graham's "participat[ion] in any form in the preparation or publication of the articles," the allegations here more than satisfy Howard's burden at the motion to dismiss stage.

For this same reason, Collins' reliance on *Tavoulareas v. Piro*, 759 F.2d 90 (D.C. Cir. 1985), which concerned a reporter whose involvement with the challenged article was limited to the earliest stage and was decided after a full trial on the merits, is similarly unavailing. *Id.* Collins was the sole reporter speaking to sources, and he worked undercover for eight months on behalf of Al Jazeera to infiltrate the underground network of illegal doping, asking questions from Al Jazeera and using their hidden cameras to secretly record footage that was ultimately used in the documentary. *Id.*; *see also Browning v. Clinton*, 292 F.3d 235, 247 (D.C. Cir. 2002) (dismissing claim only because plaintiff failed to "link[] the defendant to the *Time* publication").[7] Drawing inferences in Howard's favor, and considering the allegations in the FAC and accompanying documents, Howard has adequately alleged that Collins published the defamatory statements.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions to dismiss.

---

[7]   None of the other cases on which Collins relies is persuasive.  *Mattiaccio v. DHA Grp., Inc.*, 908 F. Supp. 2d 136, 139 (D.D.C. 2012), *Saint-Jean v. District of Columbia.*, 846 F. Supp. 2d 247, 267 (D.D.C. 2012) and *Am. Petroleum Inst. v. Technomedia Int'l, Inc.*, 699 F. Supp. 2d 258, 268 (D.D.C. 2010) do not address whether involvement in the preparation and ultimate publication of a news story qualify the defendant as a "publisher" for defamation purposes but rather address whether there was even a "publication" in the first instance.  Here, there is not serious dispute that "The Dark Side" was published; rather, the question is whether Collins was a "publisher."

DATED:   June 7, 2016                                    MILLER & CHEVALIER CHARTERED
         Washington, D.C.


                                                         /s/ Andrew D. Herman
                                                         Andrew D. Herman
                                                         DC Bar # 462334
                                                         aherman@milchev.com
                                                         900 Sixteenth Street NW
                                                         Washington, D.C. 20006
                                                         (202) 626-5800 (tel.)
                                                         (202) 626-5801 (fax)

                                                         Attorney for Plaintiff Ryan C. Howard